# CASES

## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF MINNESOTA.

---

## C. D. KENDALL v. ORANGE JUDD COMPANY.[1]

### May 24, 1912.

### Nos. 17,548—(113).

**Service of process on foreign corporation.**

 While R. L. 1905, § 4109, does not in terms require that a foreign corporation must be doing business in the state in order that process may be served upon it by service on its officers or agents in the state, yet it is the settled rule of construction placed thereon by this court that in order to meet the requirements of due process of law such a corporation must be doing business in the state in order to be so served.

**Same — "doing business."**

 In determining whether a corporation is "doing business" in the state within the purview of this statute, as construed by the court, each case

---

[1] Reported in 136 N. W. 291.

---

[Note] Soliciting trade as doing business within the state, see notes in 9 L.R.A.(N.S.) 1214; 23 L.R.A.(N.S.) 834.

 Establishing agency to handle a corporation's product within the state as doing business therein, see note in 18 L.R.A.(N.S.) 142.

 Exclusiveness of mode of service provided by statute requiring foreign corporations to designate person upon whom service of process may be made, see note in 5 L.R.A.(N.S.) 298.

must depend upon its own facts and circumstances; but it must at least appear that the transactions of the foreign corporation are such that, through the representative character of its agents operating in the state, it may be said that the corporation itself is in the state.

### Same — under Interstate Commerce act.

The question as to whether a foreign corporation is "doing business" in the state so as to be subject to service of process under R. L. 1905, § 4109, is entirely distinct from the question as to whether such a corporation is "doing business" in the state within the purview of the Somerville law (R. L. 1905, §§ 2888-2890), relative to the conditions upon which a foreign corporation may be allowed to do business in the state; and it does not follow that business which, by reason of the Interstate Commerce law, does not bring the corporation within the Somerville law, may not nevertheless bring it within R. L. 1905, § 4109.

### Same — evidence.

Evidence examined, and *held* to show that the defendant, a foreign corporation, was "doing business" in the state to such an extent that service on its president, while temporarily in the state on the business of such corporation, was sufficient, under R. L. § 4109, to confer jurisdiction upon the trial court.

Action in the district court for Hennepin county to recover $2,200 for an alleged failure to fulfil the terms of a contract for repurchase of certain stock. Defendant appeared specially for the purpose of objecting to the jurisdiction of the court, and moved to set aside the service of the summons and to dismiss the action, upon the ground the court had no jurisdiction over the defendant, because it was a foreign corporation, the cause of action accrued without the state of Minnesota, defendant was not at the date of the service engaged in doing business in the state, and had no money or property in the state. The motion was heard and denied by Dickinson, J. From the order denying the motion, defendant appealed. Affirmed.

*Helliwell, Keyes & Carroll,* for appellant.

*Cheever & Cheever, Fifield, Fletcher & Fifield* and *Fred W. Reed,* for respondent.

PHILIP E. BROWN, J.

This is an action based upon a certain alleged agreement to repur-

chase the stock of the Northwestern Orange Judd Company, a Minnesota corporation, executed by the defendant, the Orange Judd Company, a New York corporation. Service of the summons was had therein upon Herbert Myrick, of Springfield, Massachusetts, president of the defendant company, at Minneapolis, and thereafter the defendant, appearing specially for such purpose, moved upon affidavits and all the files in the case to set aside the service of the summons and to dismiss the action for lack of jurisdiction, assigning as ground for such relief that the court had no jurisdiction over the defendant or the said cause because the defendant was a foreign corporation; that the cause of action alleged in the complaint accrued without the state; that the defendant was not, at the date of the alleged service of the summons, nor at the time of such motion, engaged in doing business in the state, nor had at such times any property therein. The court heard the motion on affidavits, the files in the case, and oral testimony, the motion was denied, and the defendant appealed.

R. L. 1905, § 4109, provides: "If the defendant be a foreign corporation, the summons may be served by delivering a copy to any of its officers or agents within the state."

It is apparent that this statute does not in terms require the corporation to be doing business in the state in order to be subject to service as indicated; but such is the settled construction placed upon it by this court. See North Wisconsin Cattle Co. v. Oregon Short Line R. Co. 105 Minn. 198, 117 N. W. 391. As to what constitutes "doing business," within the meaning of the statute as thus construed, it is likewise settled that mere solicitation of business is not enough. North Wisconsin Cattle Co. v. Oregon Short Line R. Co. supra; Archer-Daniels Linseed Oil Co. v. Blue Ridge Despatch, 113 Minn. 367, 129 N. W. 765. On the other hand, it was held in the case last cited that the maintenance by a foreign railroad company of an office, jointly with other foreign railroad companies, through the medium of an unincorporated soliciting and shipping agency which actually transacted part of its shipping business, constituted "doing business"

so far as service of the process in an action arising out of such transactions was concerned.

It is manifest therefore that no general rule can be laid down which will be determinative of what constitutes "doing business" in future cases that may arise, and that each case must depend upon its own facts and circumstances; the nearest approach to a rule being suggested by Chief Justice Start in North Wisconsin Cattle Co. v. Oregon Short Line R. Co. supra, where he declared that: "Whether such a corporation is doing business in the state is a question of jurisdiction, and in its last analysis it is one of due process of law, under the Constitution of the United States." In other words, the transactions of the foreign corporation, which, of necessity, must be conducted through its agents, must be such that, through the representative capacity of such agents operating in the state, it may be said that the corporation itself is in the state.

It must be borne in mind, in this connection, that the question as to what is "doing business" within the meaning of this statute, as construed by the courts, is entirely distinct from the question as to what constitutes "doing business" within the Somerville law (R. L. 1905, §§ 2888–2890), relative to the conditions to the right of a foreign corporation to do business in the state. Under the Somerville law transactions within the protection of the Interstate Commerce law cannot constitute "doing business," because the state has no right to impose conditions thereon; but it does not follow that such transactions may not, nevertheless, constitute doing business within the purview of R. L. 1905, § 4109, relative to service of process.

The question, then, on this appeal, is whether the evidence in this particular case shows that the defendant, at the time of the service upon its president at Minneapolis, was "doing business" in the state to such an extent as to render it subject to suit and process under the act last above recited. It does not clearly appear where the purchase agreement sued on was executed, but it seems that it was not done in Minnesota. It appears, further, that, excepting the plaintiff's stock subscription, to which we will refer later, all the transactions out of which this agreement grew took place outside of the state.

The first of these, so far as appears from the record, took place at Brookings, South Dakota, October 21, 1910, whereby the Northwestern Orange Judd Company, which, as we have already stated, was a Minnesota corporation, purchased an agricultural journal, then published at Brookings by a South Dakota corporation. Immediately thereafter the name of the journal was changed to the "Orange Judd Northwest Farmstead," and arrangements were made whereby the defendant undertook the publication of the said journal for a specified portion of the profits, it being agreed that the Northwestern Orange Judd Company would reimburse the defendant for the expense of such publication in case the profits should not reach a specified amount; but whether this transaction amounted to anything more than an agreement to manufacture does not appear except by way of inference from subsequent transactions and events. Herbert Myrick, the defendant's president, testified in his affidavit filed in the case that the defendant had no interest in the said journal other than indicated by the said agreement; but the agreement itself was not offered in evidence.

On or about October 21, 1910, the plaintiff subscribed, at Minneapolis, for twenty-two shares of the said Northwestern Orange Judd Company, and thereafter a certificate of stock was delivered to him by the said company, on the back of which was indorsed the said repurchase agreement, purporting to have been executed by the defendant, whereby the defendant agreed to repurchase the said stock upon six months' notice. This agreement was not executed in Minnesota. On or about November 15, 1910, the plaintiff gave notice, pursuant to the terms of the said agreement, of his desire that the defendant should repurchase the said stock as agreed, and the defendant, having, upon maturity of such notice, failed so to repurchase, this action was brought September 1, 1911.

In the meantime, however, and immediately after the purchase of the said journal by the Northwestern Orange Judd Company, offices were opened at 335 Palace Building, Minneapolis, at and from which various transactions connected with the said journal, under its new name of the "Orange Judd Northwest Farmstead," were conducted, and a little later an auxiliary office was established in the

Globe Building in the same city. It does not appear who leased these offices. There was uncontradicted evidence that the defendant had no lease thereon, and the Northwestern Orange Judd Company having, so far as any participation in the matters transpiring subsequently to its purchase of the said journal is concerned, completely disappeared from the scenes, except for the allegation of the verified complaint that it was still a Minnesota corporation at the time of the suit, and the testimony of the defendant's president, in his affidavit, that it still existed and still owned and had at all times owned the Orange Judd Northwest Farmstead. It does appear, however, that the defendant's name appeared on the doors of the said offices, and there remained until about May, 1911, when, at or about the time of the expiration of the plaintiff's notice to repurchase, it was removed from the office at 335 Palace Building, and would have been removed from the office in the Globe Building also, but for an oversight upon the part of Clifford Willis, editor of the Farmstead, to whom the duty of removing such sign seems to have been assigned.

At or about the same time the employees at the offices in both the Palace and the Globe Buildings received "notice from the east," purporting to come from the Phelps Publishing Company, a foreign corporation, residence undisclosed by the record but authorized to do business in Minnesota, that the said employees were thenceforth to consider themselves to be in the employ of the said Phelps Publishing Company. This notice was communicated to most of the said employees by the said Clifford Willis, who besides being editor of the Farmstead, as above stated, had general charge of the Minneapolis offices; and thereafter the said employees, including the said Willis, received their pay by the Phelps Publishing Company checks and considered themselves to be in such company's employ. Otherwise, however, and excepting the substitution of the name of the Phelps Publishing Company on the Palace Building office door in place of the defendant's, things went on in the said offices as though no change had been made, and hence no further reference to such change is necessary in connection with the transaction hereinafter related.

It must be stated, however, that there is uncontradicted testimony in the case that at the time of the bringing of this action the Phelps Publishing Company owned, and for some months prior thereto had owned, the equipment of the said offices, and that the situation subsequent to such change was due to an arrangement between the Phelps Publishing Company, of which, by the way, the said Herbert Myrick was likewise president, and the defendant, whereby the former did the manual work of publishing several periodicals published by the two companies respectively, and also looked after the defendant's business so far as the same was involved in that which went on at the Minneapolis offices, the defendant accounting to the Phelps Publishing Company for its share of the expense of such work and operations.

The transactions conducted at the said offices in Minneapolis related to the circulation and advertising departments of the Orange Judd Northwest Farmstead and several other periodicals admittedly owned by the defendant and the editorial department of the Farmstead, and also the Farm and Home, owned and published by the Phelps Publishing Company. Clifford Willis was, as we have stated, editor of the Farmstead, writing and collecting his material at or from the Palace Building office and sending the same to Springfield, Massachusetts, where the editor in chief and managing editor resided, and where the defendant's financial books and records were kept and the Farmstead was printed and mailed to its subscribers.

About fifteen employees were engaged in the Minneapolis offices in connection with the soliciting of advertisements and subscriptions. All of them were more or less under the general supervision of Willis, but the heads of their departments resided and had their offices elsewhere. T. A. Barrett, treasurer of the defendant, had general charge of advertising and subscription contracts, with office in New York, where the financial records relative to advertisements and subscriptions were kept. H. B. Clark was the western circulation manager of the defendant's several publications, with residence and office at Chicago, where part of the records of the circulation of the Farm-

stead were kept, the rest being kept at Springfield, Massachusetts, all notices of expiration, etc., being sent out from Springfield. Otto H. Haubold was western advertising manager of the Farmstead, residence and office at Chicago, where all advertisements except "live stocks," solicited or obtained from Minnesota, were passed upon and accepted or rejected, the solicitors working out of the Minneapolis offices having no power to make any contracts whatever; and the same conditions prevailed with respect to the live-stock advertisements, except that they were handled by T. A. Barrett, at New York.

The circulation and advertisement solicitors for the Farmstead, however, worked out of the Minneapolis offices. Fred F. Clark was in charge of the office in the Globe Building and looked after the circulation of the Farmstead and other Orange Judd publications, under the said H. B. Clark, of Chicago, and on the door of the said office was the sign, "The Circulation Department of the Orange Judd Company," which, as above stated, Mr. Willis failed, through oversight, to remove when the notice came from the east that the Orange Judd Company's employees in the Minneapolis offices were thenceforth to consider themselves employed by the Phelps Publishing Company. In this connection it may be noted that the Farmstead's circulation in Minnesota was from twenty-seven thousand to thirty-five thousand at one dollar a year. About eighty solicitors worked out of this office in the Globe Building, taking subscriptions in some half dozen or more northwestern states, including Minnesota, working on commission and turning the proceeds, less commissions, in to Willis, at the Palace Building office. These solicitors also took subscriptions for another publication not published by the defendant, but were instructed by the said Fred F. Clark always to take a subscription for the Farmstead.

As already indicated, the Palace Building office was in charge of Clifford Willis, editor of the Farmstead, and he, as such editor, was subject to Herbert Myrick, the defendant's president, as editor in chief, and W. A. Fulton, of Springfield, Massachusetts, as managing editor; but it appears that practically all the editorial work was done by Willis at the Palace Building office, Myrick writing

occasional editorials from wherever he happened to be at the time,. which at times was at the Palace Building office, and the managing editor's duties being practically confined to the matter of determining what part of the material furnished by Willis should go into the paper, etc. All the daily receipts from subscriptions to the Farmstead, procured by the solicitors working out of the Minneapolis offices, were turned over to Willis, and by him were remitted to T. A. Barrett, the defendant's treasurer, at New York; checks being drawn in favor of the defendant. A special man, John E. Larson, working in or out of the Palace Building office, and practically under Willis, though directly responsible to A. C. Haubold, at Chicago, handled the live-stock advertisements for the Farmstead. At least a part of the proceeds of this business was turned over to Willis and by him remitted the same as the subscription proceeds. Besides Larson, there were two other men working in or out of such office on advertising, but the proceeds of their work did not go through such office. The traveling agents, working out of Willis' office, and soliciting advertisements for the Farmstead, likewise solicited advertisements for the New England Homestead, the American Agriculturist,. and the Orange Judd Farmer, all published by the defendant. They seem to have been paid by salary with the defendant's checks until the notice of the change of employment came in the spring of 1911. One Charles E. Hall, working in or out of the Palace Building office, likewise solicited advertisements for the Farmstead and the other journals published by the defendant above mentioned, and also for the Farm and Home, published by the Phelps Publishing Company, and the Dakota Farmer, of which business the Dakota Farmer got the most and the Farmstead next. W. H. Castner, another solicitor working out of the Palace Building office, worked under the same general conditions, etc., stated as to Hall. Both of these men, like the other men working in or out of the Minneapolis offices, had considered themselves employed by the defendant until the notice of the change of employment came, after which they considered themselves employed by the Phelps Publishing Company.

That portion of the Farmstead which, in the record, is called its "Masthead," was as follows:

"THE ORANGE JUDD NORTHWESTERN FARMSTEAD,
Weekly
"Entered at postoffice at Springfield, Mass.,
"as second class mail matter.
"Trade Mark Registered"

Then followed, after announcement of subscription rates, etc.:
"Address orders to our office nearest you.
"Orange Judd Company, Publishers,
"Springfield, Mass.
"Minneapolis                           Chicago
"335 Palace Building          1209 Peoples Gas Building
"Aberdeen, S. D. and Ashland Building, New York City
"Clifford Willis, Editor."

Each issue also contained a considerable number of advertisements both of livestock and other advertisements in St. Paul and Minneapolis and throughout the state of Minnesota, and each issue contained also the following announcement:

"FARMERS EXCHANGE ADVERTISING"
*   *   *
"ORANGE JUDD
"NORTHWEST FARMSTEAD,
"Palace Bldg., Minneapolis, Minn."

The "Masthead" of the Orange Judd Farmer instructed advertisers to address the publishers' headquarters at Chicago, and gave address at Springfield, Chicago, and New York. The "Masthead" of the New England Homestead gave address at Springfield, Mass. The subscription blanks of the Farmstead gave address, "Northwest Farmstead, Minneapolis," and no other. The livestock advertising order blanks of the Farmstead gave address, "Orange Judd Northwest Farmstead, 335 Palace Bldg., Minneapolis," on both the front

and the reverse sides. The duplicate advertising contract carried the following: "The Orange Judd Northwest Farmstead, Minneapolis," "The Orange Judd Farmer, Chicago," "The New England Homestead, Springfield," with address "Orange Judd Company, Minneapolis, Chicago, New York, Springfield, Mass." The circulars giving advertising rates in the "Orange Judd Weeklies" gave address of the Farmstead as "Minneapolis, Minn.," that of the Orange Judd Farmer as "Chicago, Ill.," that of American Agriculturist as "New York, N. Y.," and that of the New England Homestead as "Springfield, Mass." The advertising contracts of the Phelps Publishing Company's publication, the "Farm and Home," gave the publication address as "Chicago, Ill.," and "Springfield, Mass.; 1209 People's Gas Bldg., Chicago, Ill.; Aberdeen, S. D.; 335 Palace Bldg., Minneapolis, Minn.; and 439 Lafayette St. New York."

It appeared that the total circulation of the Orange Judd Weeklies was about five hundred thousand, of which the Farmstead had about one hundred thousand, something like twenty-seven thousand to thirty-five thousand of the same being in Minnesota; and that the total proceeds of the defendant's operations in Minnesota approximated $50,000 or $60,000 a year, and that at the time of the bringing of this action there were existing contracts in the state for advertising in the Farmstead, unpaid for.

When the service was made upon the defendant's president, Herbert Myrick, it appears that he was at the office at 335 Palace Building, Minneapolis, conferring with Clifford Willis, editor of the Farmstead, and the record contains the affidavit of Walter M. Cheever, one of the plaintiff's attorneys, to the effect that during the conversation which preceded the service of the summons, and at which E. L. Spurling and Clifford Willis were present, the said Myrick stated that he desired to avoid litigation over the agreements indorsed on the back of the said Northwestern Orange Judd Company's stock certificates; that he would be in Minneapolis for several days; that the business of the defendant in Minnesota had grown to such extent that either he or some other officer of the defendant would have to be in Minnesota from time to time in the future; and that he (Myrick) would give notice of the time and place when some of the

said officers would be present in the state and could be served with process.

The affiant further stated that after the above-recited conversation had taken place, Mr. Helliwell, one of the defendant's attorneys, appeared, and that in reply to a question from him as to whether he (Myrick) was in Minneapolis particularly upon the matter of the Brookings stockholders (manifestly referring here to the holders of the stock of the Northwestern Orange Judd Company with the above-mentioned agreement indorsed thereon), he (Myrick) replied that he was not there particularly on such account, but was looking after the general business and interests of the defendant and its publications. This affidavit is supported by the affidavit of E. L. Spurling, mentioned in said affidavit, in all respects; but the latter portion thereof is denied by the affidavit of the said Helliwell. There is no affidavit or testimony of Clifford Willis on this point, though he did testify that Myrick was frequently in Minneapolis on the defendant's business, mostly on the business of the Farmstead.

Upon the above-recited facts and evidence we think the trial court was abundantly warranted in holding that the defendant was doing business in the state to such extent as to render it subject to action and process therein. Indeed, we think that no other conclusion could reasonably have been reached. When we consider that practically all the facts proved were peculiarly within the knowledge of the defendant and had to be elicited from manifestly and openly unwilling and hostile witnesses (see Strom v. Montana Central Ry. Co. 81 Minn. 346, 84 N. W. 46), we think that a surprisingly clear case was made. It is true that the conclusion that the defendant was "doing business" in the state may, to a certain extent, depend upon inferences from the facts proved; but it is likewise true that if the inferences fairly deducible from these facts were fully indulged they would lead to the conclusion that the defendant not only was "doing business" in the state, but was also engaged in a deliberate attempt to cover such fact through the kindly offices of the friendly Phelps Publishing Company that so suddenly, and at such an opportune moment, appeared upon the scenes, and stood, in effect at least, between the defendant and the irate stockholders of the North-

western Orange Judd Company. To say the least, the coincidence in point of time of the maturity of the plaintiff's notice demanding a repurchase of his stock by the defendant and the date when the Phelps Publishing Company, Herbert Myrick, president, so suddenly appeared where the defendant had theretofore at least appeared to be, is very striking. The advantage to be derived by the defendant from forcing these Northwestern Orange Judd Company stockholders to follow the defendant to other states, and possibly half across the continent, in order to have their alleged claims adjudicated upon, is too obvious, in the light of the above-mentioned coincidence, to be ignored. We might also indulge in inferences as to the true relations between the defendant and the Northwestern Orange Judd Company. But upon the whole record we are satisfied, without indulging any inferences whatever other than those too plain to be overlooked, that the conclusion reached by the trial court was correct.

Furthermore, we take this opportunity to say that, while we are not inclined to deny foreign corporations the benefit of their constitutional rights, they must, if they enter this state and do business therein, comply with the laws thereof and submit to the process of its courts.

Order affirmed.